# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | | |
|---|---|---|
| **CYNTHIA WILLIAMS, Individually** | ) | |
| **and as Anticipated Administrator of the** | ) | |
| **ESTATE OF MALCOLM MOORE** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action** |
| | ) | **File #:** |
| **v.** | ) | |
| **T-S MANUFACTURING CO.; AUTOMATION &** | ) | _____ |
| **ELECTRONICS (USA) LIMITED;** | ) | |
| **JOHN DOES 1-10;** | ) | |
| **ABC CORPORATIONS A-Z,** | ) | |
| | ) | |
| **Defendants** | ) | **Jury Trial** |
| | ) | **Demanded** |
| _____ | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Cynthia Williams ("Plaintiff"), and hereby brings this Complaint, individually, for the wrongful death of her son, Malcom Moore, and for state-law tort claims in her capacity as the anticipated administrator of the estate of Malcom Moore, deceased, against Defendant T-S Manufacturing Co. (hereinafter referred to as "T-S"), Defendant Automation & Electronics (USA) Limited (hereinafter referred to as "A&E"), John Does 1-10, and ABC Corporations A-Z (collectively "Defendants"), respectfully showing the Court as follows:

## PARTIES

1.

Plaintiff is the surviving mother of Malcom Moore, who died with no surviving spouse and no surviving children. Plaintiff seeks to recover individually for the wrongful death of her son, Malcom Moore.

2.

Plaintiff is the anticipated administrator of the Estate of Malcom Moore and seeks to recover claims against Defendants arising in tort in her capacity as administrator once duly appointed.

3.

Plaintiff resides at 9 Mighty Creek Lane, Hazlehurst, Georgia, 31539 and is a citizen of the state of Georgia.

4.

T-S is a Canadian company whose principal place of business is TS Manufacturing Company, 2 Fleetwood Road, Lindsay, ON K9V 6H4 Canada. T-S is not a citizen of any U.S. state. T-S has a sales specialist named "Peter M" who is dedicated to the Southern United States, including the State of Georgia.

5.

At all relevant times, Defendant T-S was doing business in the State of Georgia and was designing, manufacturing, and producing products and materials

that are consistently used or consumed in the State of Georgia in the ordinary course of trade, including the subject machine and related components at issue in this case. Defendant T-S may be served with process at its principal place of business in Canada.

6.

Defendant A&E is based in North Carolina and is not a citizen of the State of Georgia.

7.

At all relevant times, Defendant A&E was doing business in the State of Georgia and was designing, manufacturing, and producing products and materials that are consistently used or consumed in the State of Georgia in the ordinary course of trade, including the subject machine and related components at issue in this case. Defendant A&E may be served with process at its principal place of business through its registered agent and President, Joseph Korac, at 6 Winners Circle Suite 4, Arden, North Carolina, 28704.

8.

T-S and A&E derive significant revenue from Georgia and attend trade shows in Georgia in order to receive and increase business from customers in Georgia. For example, T-S attended the International Woodworking Fair in Atlanta, Georgia, at booth C1726 in 2022. Additionally, according to T-S's website, T-S is attending the

International Woodworking Fair in Atlanta, Georgia at booth C2333 from August 6, 2024 to August 9, 2024.

9.

The following news release by T-S regarding A&E reflects their relationship:







10.

Defendants ABC CORPORATIONS A-Z and JOHN DOES 1-10 are entities and individuals whose true names or capacities are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff will amend the Complaint to show said Defendants' true names when such have been ascertained.

11.

Plaintiff alleges that JOHN DOES 1-10, at all times relevant to this Complaint, were employees, actual agents, or apparent agents of Defendants, were acting incident to and within the course and scope of their employment or agency with Defendants, and were responsible for manufacture, sale, repair, maintenance, and design of the products described herein.

12.

Plaintiff alleges that ABC Corporations A-Z, at all times relevant to this Complaint, owned, controlled, operated, or managed the entities and facilities that were responsible for the manufacture, sale, repair, maintenance and design of the products described herein.

## JURISDICTION AND VENUE

13.

This is an action arising in strict liability and negligence, with complete diversity of citizenship and the amount in controversy exceeds $75,000. Therefore, this action is subject to the jurisdiction of this Court through 28 U.S.C. § 1332.

14.

This Court has personal jurisdiction over T-S under O.C.G.A. § 9-10-91, as evidenced by the fact that it was doing business in the State of Georgia and was designing, manufacturing, and producing products and materials that are consistently used or consumed in the State of Georgia in the ordinary course of trade, including the subject machine and related components at issue in this case.

15.

T-S purposefully established minimum contacts with Georgia and reasonably should have anticipated defending a lawsuit there as demonstrated by the fact that it derives significant revenue from Georgia and attends trade shows in Georgia in order to receive and increase business from customers in Georgia.

16.

The exercise of jurisdiction over T-S comports with traditional notions of fair play and substantial justice.

17.

This Court has personal jurisdiction over A&E under O.C.G.A. § 9-10-91, as evidenced by the fact that it was doing business in the State of Georgia and was designing, manufacturing, and producing products and materials that are consistently used or consumed in the State of Georgia in the ordinary course of trade, including the subject machine and related components at issue in this case.

18.

A&E purposefully established minimum contacts with Georgia and reasonably should have anticipated defending a lawsuit there as demonstrated by the fact that it derives significant revenue from Georgia and attends trade shows in Georgia in order to receive and increase business from customers in Georgia.

19.

The exercise of jurisdiction over A&E comports with traditional notions of fair play and substantial justice.

20.

This Court has personal jurisdiction over John Does 1-10. Facts showing such jurisdiction will be supplemented following the ascertainment of their identity.

21.

This Court has personal jurisdiction over ABC Corporations A-Z. Facts showing such jurisdiction will be supplemented following the ascertainment of their identity.

22.

Venue is proper in this Court as a substantial part of the events or omissions giving rise to the claim occurred here. See 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

23.

On or about July 6, 2022, MALCOLM MOORE (hereinafter referred to as "MOORE") was killed while at work cleaning around a "De-Scrambler" or "Unscrambler" machine—in the Green Stacker under-portion—at Beasley Forest Products in Hazlehurst, Georgia.

24.

Prior to his death, MOORE worked at the Beasley Forest Products sawmill ("Sawmill") at 712 Uvalde Highway in Hazlehurst, Georgia.

25.

The Sawmill where MOORE worked produces, among other things, grade lumber in Hazlehurst, Georgia.

26.

The Sawmill where MOORE worked is one of the largest production hardwood sawmills in the United States.

27.

In June of 2014, a fire at the Sawmill occurred. After the 2014 fire, the Sawmill attained a new 100 bay drop sorter by contracting with Defendant T-S Manufacturing Co. (hereinafter "T-S") to design and build the sorter to integrate: lumbar grading, trimming, re-edging, sorting, and packing into a complete system.

28.

A true and accurate brochure of the T-S machine is shown here:



29.

According to this brochure: "TS Manufacturing's Unscramblers are custom built to suit the application.  Many people underestimate the importance of a simple unscrambler, but they can be an overlooked efficiency killer."

30.

In 2015, the Sawmill was producing over 100 million board feet of lumber per year using the T-S machine.

31.

In 2015, Automation & Electronics (USA) Limited (hereinafter "A&E") engaged in a project at the Sawmill that entailed the provision of a new Grade, Trim, Sort, and Stackline Machine for hardwoods.

32.

For this Project, A&E provided their BinView Scada Software program, production reports, and PLC controllers for the entire line at the Sawmill, including Ethernet Synchronized Motion Control, interfaced with USNR Trimmer Optimizer combined with TS Multi-Saw Trimmer.

33.

Riley Smith worked as a sales manager for T-S at the time of this Project. In the November 2015 A&E Newsletter, when asked what the project entailed, Riley Smith stated "the electronics installation and startup of a large capacity grading

sorting and stacking line-manufactured by T-S, in America's largest hardwood production sawmill."

34.

In the November 2015 A&E Newsletter, when asked why A&E was chosen for the Project, Riley Smith stated "We partner with A&E in the US because of their understanding of the American lumber industry and their ability to effect sound electronics programming, software and support in a mill environment".

35.

In the November 2015 A&E Newsletter, in regard to the Project, Riley Smith further stated, "Some difficulties were encountered, but A&E pulled out all the stops to see the project through to its completion and ensure the mill was up to full production capacity and full operating production capabilities."

36.

In the United States—and specifically in Georgia—A&E acts as a mill electronics partner with T-S, and did so at the Sawmill where MOORE worked.

37.

T-S provided the design and manufacture of the machinery, while A&E provided electronics, energy, and computer-based programming to the machines at the Sawmill where MOORE worked.

38.

MOORE was a stick layer at the Sawmill and was working as such on July 6, 2022.

39.

Dylan Abel ("Abel") worked as the main stack operator at the Sawmill on July 6, 2022.

40.

July 6, 2022 was a hot summer day in Georgia, reaching extreme temperatures, and the Sawmill was dusty from wood chips and sawdust.

41.

Cody Heitz ("Heitz") worked as operator of the Unscrambler at the Sawmill on July 6, 2022.

42.

After running a "pack" of timber, Abel told all the workers to clean up around the stacker.

43.

It was normal for workers at the Sawmill to clean the stacker before starting the cutting of a new load of timber.  All workers at the Sawmill share the job of cleaning up all around the machinery regardless of their job title.

44.

MOORE proceeded to clean up around the stacker.

45.

MOORE was alone reached the underneath of the Green Stacker part of the Unscrambler.

46.

MOORE went underneath the Unscrambler with his gloves to clean the excess wood chips and sawdust that lay under it.

47.

At all times pertinent to this action, MOORE was acting in a reasonable and non-negligent manner.

48.

MOORE cleaned under the Unscrambler for two minutes and fifty-six seconds before the machine was turned on again.

49.

Abel dropped another pack of wood around three minutes later, believing his co-workers were done cleaning.

50.

Heitz attempted to turn his machine on after Abel yelled to Heitz, but the machine would not turn on.

51.

Heitz assumed that Abel had the machine off on his end, so he walked towards Abel to let him know that the Unscrambler was not turning on.

52.

Heitz usually looks under the Unscrambler to see if anybody is still down there hanging out or cleaning, but he did not do so this time.

53.

On Heitz's way to Abel, Abel turned the machine on from his end and the Unscrambler started running.

54.

When this happened, Abel and Heitz heard screaming followed by a loud pop.

55.

When Heitz heard the screaming, he ran back to his station and flipped his machine off.

56.

No camera had a view under the unscrambler.

57.

Heitz saw what had happened to MOORE and immediately called 911. Abel ran to see what happened to MOORE.

58.

Two of the dip-tank operators also ran to MOORE's aid, but it was too late.

59.

MOORE had been swept under the Unscrambler and killed in a gruesome fashion.

60.

MOORE's leg had snapped almost entirely off, and his body was fatally mangled.

61.

This was an incredibly painful death.

62.

Security footage shows that MOORE was cleaning under the Unscrambler for two minutes and fifty-six seconds.

63.

It is also clear that the underside of the Unscrambler was cluttered with sawdust and wood chips, as a large mass of wood chips bursts out when the machine was turned on.

64.

Photos taken by OSHA after the incident show the arrangement of the machinery. One of the routes to the Unscrambler is down the stairs.  The following

photo is of the De-scrambler from the side, with a yellow arrow showing the location of the operator, Cody Heitz.  A purple arrow shows the inadequate guarding with the missing top rail.  The red arrow shows where MOORE was found:



65.

Security footage shows that workers took the exact route MOORE took when they went to check on him.

66.

Heitz worked as the Unscrambler operator that day.  The following photo shows the operating position for Heitz.  The arrow shows the location where

MOORE was located.  The platform side closest to the machine was not guarded (circled in red), and there was a moving chain above a fall distance greater than four feet:



67.

The following photo shows Heitz's vantage point from the controls of the operator of the De-Scrambler to the underneath of the De-Scrambler.  In particular, the photo shows that the operator cannot see the area where MOORE was cleaning. The yellow arrow in the photo below shows where MOORE was cleaning:



68.

The main circuit breaker for the De-Scrambler is shown in the photo below:



69.

The following photo shows the De-Scrambler from the side:



70.

The following photo shows the overall De-Scrambler from the front. The yellow arrow shows where MOORE was found. The purple arrow shows where the guard rail is missing the upper rail:



71.

The following photo shows the underside of the De-Scrambler. MOORE was found facing towards the belt.  The arrow shows where MOORE was found:



72.

The following photo shows where MOORE was dragged underneath and wrapped around the machine, by the chains:



73.

The lockout-tagout system was inadequate and or insufficient to keep the power de-energized when workers were in harm's way of the machinery.

74.

T-S and A&E failed to provide appropriate Lock Out Tag Out mechanisms, warnings, and instructions.

75.

T-S serviced the Unscrambler for the Sawmill and knew that the underneath of the stacker required constant maintenance to remove sawdust and wood.

76.

T-S serviced the stacker for the Sawmill and knew that cleanup of wood and sawdust would be required underneath the machinery where MOORE was killed.

77.

T-S and A&E designed, manufactured, sold, and offered ongoing equipment-support services and provided such support services to the Sawmill where MOORE worked on an ongoing basis.

78.

T-S provided the design and manufacture of the machinery, while A&E provided electronics, energy, and computer-based programming to the machines at the Sawmill where MOORE worked, including Log Out Tag Out mechanisms, software and support, and electronically interlocked gates, which, when opened, disconnect the power and set the hoist brakes, which are important for the safety of workers.

79.

A&E and or T-S failed to provide appropriate Lock Out Tag Out mechanisms and electronically interlocked gates for all area of the machinery at the Sawmill, and

in particular, failed to do so with regard to the Green Stacker portion of the Unscrambler machinery that injured and killed MOORE.

80.

T-S Unscramblers are custom built to suit the application.  T-S and A&E worked in conjunction to custom-build and construct the machines at the Sawmill where MOORE worked.

81.

The Green Stacker portion of the Unscrambler at the Sawmill where MOORE worked was not guarded by enclosures to prevent unauthorized entry, nor did it have electrically interlocked gates to disconnect the power when opened.

82.

T-S and A&E knew that workers would have to go beneath the Green Stacker portion of the Unscrambler and be exposed to and potentially caught in and struck by hazards, as the design requires regular cleaning and maintenance.

83.

T-S and A&E did not provide proper guarding on the production machines—in particular, beneath the Green Stacker portion of the Unscrambler—despite knowing that workers would be close to the point of danger on a routine basis.

84.

T-S and A&E designed the production machines—in particular, beneath the Green Stacker portion of the Unscrambler—such that workers must clean the area around the mill daily, and maintenance and servicing must be performed.

85.

By this design, T-S and A&E knew that workers would pass through, in, around, and near this hazard throughout the day to gain access to it and to other parts of the plant.

86.

T-S and A&E knew that workers work around and pass by this conveyor system—and in particular, the area beneath the Green Stacker portion of the Unscrambler—throughout the day whenever the workers were required to clean under the machine.

87.

T-S and A&E did not provide or affix a hazardous energy-isolating setup or device to lockout the Green Stacker and DeScrambler (or beneath the Green Stacker portion of the Unscrambler) before workers could enter into the areas where unguarded (and potentially moving) bar-chain conveyors and in-running nip points were located.

88.

The operator controls lacked a warning and or detection system whereby operators would be aware of their co-workers' proximity to dangerous machinery. Per the design of T-S and A&E, when operators re-start the machinery, the operator yells that he was "dropping a pack".

89.

It was inadequate and insufficient for workers at the Sawmill to rely on Abel yelling that he is dropping a pack for workers to know that the machine is starting and to get out of the way.

90.

T-S and A&E failed to provide appropriate warning signs of the dangers of going under the unscrambler, instead designing the unscrambler in a way that necessitated workers go under the unscrambler in order to maintain the unscrambler.

91.

Additionally, from the investigation photos, the only warning sign regarding the dangers of going under the Unscrambler was on the opposite end of the Unscrambler, which was divided by the stacker.

92.

Furthermore, this warning sign only instructs those who have the authority to operate the power mechanism of any preventative actions they may take.

93.

T-S and A&E failed to equip and or implement appropriate warnings, and or an electronic gate, and or other modern instrumentalities such as Lockout/Tag-Out mechanisms, alarms, detectors, sensors, and or camera systems that would prevent the injury and death of workers at the Sawmill from underneath the stacker, which Defendants knew would require constant maintenance by workers who were exposed to the dangers of the machinery being energized.

94.

Precautions such as electronic gates, appropriate Lock Out Tag Out mechanisms, alarms, detectors, sensors, and or camera systems existed and were readily available at the time of MOORE's injury and death but were not used appropriately at the Sawmill as a result of T-S and A&E's actions and inactions.

95.

There is no countdown or alarm that sounds when the Unscrambler is turned on.

96.

T-S and A&E did not provide or design appropriate area access-restrictions and or enclosures (such as electrically interlocked gates which disconnect the power when opened) nor affix appropriate notice of pending hazards in the areas around the Green Stacker and DeScrambler (or beneath the Green Stacker portion of the

Unscrambler), where workers were exposed to caught-in and could be struck by hazards.

97.

T-S states on its website: "T-S is committed to the sustained operation of all your machinery with quick access to our machinery technicians". T-S technicians, who were acting within the course and scope of their agency and employment were aware of the hazards T-S placed at the Sawmill where MOORE worked.

## COUNT I:

## Strict Liability Against Defendants

98.

The allegations set out in paragraphs 1-97 above are incorporated herein.

99.

Defendants designed, manufactured, and sold the subject machine to Beasley Forest Products, and MOORE was an end user of this product.

100.

This action was brought within the applicable statute of limitations and statute of repose.

101.

The subject machine, when sold, was not merchantable and reasonably suited to the use intended and its condition when sold.

27

102.

The design, manufacture, equipping, and production of the subject machine was defective because the risk of harm outweighed the utility of the design of the product, as it failed to isolate and de-energize hazardous energy in the area that injured and killed MOORE and allowed the machine to be moved during a foreseeable use of the product.

103.

The design, manufacture, equipping, and production of the subject machine was also defective because it failed to incorporate alternative design safety devices which were technologically feasible and marketable; these devices would have prevented this foreseeable incident. Such devices include enclosures to prevent unauthorized entry, electrically interlocked gates that disconnect the power when opened, appropriate Lockout/Tag Out mechanisms, alarms, detectors, sensors, and/or camera systems.

104.

A product sold without warning regarding this particular use is in a defective condition, and the subject machine was sold without warnings to users cleaning them. Thus, the subject machine was in defective condition when sold.

105.

The aforementioned defective conditions were present and existed at the time the subject machine left the control of Defendants.

106.

Defendants furthermore had a continuing opportunity to implement such foreseeable safety precautions which would have prevented the incident.

107.

As a direct and proximate result of the defective design and manufacture of the subject machine, MOORE was swept up and killed by the subject machine and suffered pre-death mental distress, pain and suffering, fatal injuries, wrongful death, and damages for the loss of his life.

**COUNT II:**

**Negligent Design and Manufacture Against Defendants**

108.

The allegations set out in paragraphs 1-97 above are incorporated herein.

109.

This action was brought within the applicable statute of limitations.

110.

Defendants were under a duty to exercise ordinary care in the design and manufacture of the subject machine.

111.

T-S and A&E have a duty to ensure their dangerous instrumentalities and machinery have safeguards that protect against foreseeable hazards, including the probability of momentary worker forgetfulness and worker lack of attention in a loud, hot, dusty environment that T-S and A&E help foster.

112.

Defendants breached their duty to exercise ordinary care in the design and manufacture of the subject machine. Specifically, the subject machine was negligently designed, equipped, and manufactured, as it allowed for the moving of machinery in an unsafe manner during foreseeable maintenance and use of the product.

113.

The subject machine was also negligently designed and manufactured because it failed to incorporate a safety device to warn a machine operator that a human being was in imminent danger of death and/or incorporate safety mechanisms that would prevent said death.

114.

As a direct and proximate result of the negligent design and manufacture of the subject machine, MOORE was swept up and killed by the subject machine and

suffered pre-death mental distress, pain and suffering, fatal injuries, wrongful death, and damages for the loss of his life.

## COUNT III:

## Claim For Negligent Service And Maintenance Against Defendants

### 115.

The allegations set out in paragraphs 1-77 and 97 above are incorporated herein.

### 116.

This action was brought within the applicable statute of limitations.

### 117.

At all times relevant to this action, Defendants held themselves out as corporations which would carefully and competently repair, retool, service, maintain, inspect, monitor, equip, and otherwise provide safe maintenance of the subject machine and component parts.

### 118.

At all times relevant to the action, Defendants had a duty to exercise due care for those, including MOORE, who might foreseeably be affected by its activities, including its maintenance, repair, inspection, equipping, and servicing of the subject machine.

119.

Defendants breached this duty when they negligently supplied, repaired, maintained, equipped, monitored, and or inspected the subject machine.

120.

Defendants knew or should have known of the dangerous conditions created by their failure to property repair, maintain, equip, and or inspect the subject machine.

121.

As a direct and proximate result of the negligent service and maintenance of the subject machine, MOORE was swept up and killed by the subject machine and suffered pre-death mental distress, pain and suffering, fatal injuries, wrongful death, and damages for the loss of his life.

**COUNT IV:**

**Negligent Training and Inspection Against Defendants**

122.

The allegations set out in paragraphs 1-77 and 97 above are incorporated herein.

123.

This action was brought within the applicable statute of limitations.

124.

At all times relevant to this action, Defendants had a duty to train and or inspect the use of their dangerous instrumentality in order to ensure that their machinery would not cause foreseeable harm to human life.

125.

Defendants breached this duty by failing to do so and as a direct and proximate result of this failure, MOORE was swept up and killed by the subject machine and suffered pre-death mental distress, pain and suffering, fatal injuries, wrongful death, and damages for the loss of his life.

## COUNT V:

### Failure To Warn Against Defendants

126.

The allegations set out in paragraphs 1-97 above are incorporated herein.

127.

This action was brought within the applicable statute of limitations.

128.

At all times relevant to this action, Defendants had a continuing duty to warn of dangers associated with the design, use, and operation of the subject machine.

129.

T-S and A&E had a duty to warn of foreseeable dangers arising from the reasonable use for which the subject machine was intended, and a duty to exercise reasonable care to inform third persons, including Malcom Moore, of the dangerous condition or of the facts which make the subject machine likely to become dangerous.

130.

T-S and A&E had reason to anticipate that danger may result from cleaning under the subject machine, and they failed to provide adequate warning of danger from such use.

131.

Cleaning under the subject machine was a foreseeable use of the product with a severe and fatal danger, and it was foreseeable that employees at the Sawmill would have limited knowledge of the likelihood of that danger given the complex mechanical and electronic nature of the subject machine.

132.

From the time the subject machine was designed, marketed, distributed, sold, and placed into the stream of commerce until the time of MOORE's death, the Defendants were aware of the dangerous and defective design and manufacture of the subject machine as well as the dangers posed by the machine.

133.

From the time the subject machine was designed, marketed, distributed, sold, and placed into the stream of commerce until the time of MOORE's death, T-S and A&E by the application of reasonable, developed human skill, and foresight should have had knowledge of the dangers posed by the subject machine.

134.

Defendants failed to warn users of the subject machine of the dangers associated with and inherent within the subject machine.

135.

T-S and A&E breached their duty to warn of the general dangers of the subject machine, as well as the specific dangers of cleaning under the subject machine when they failed to adequately communicate these warnings to MOORE.

136.

T-S and A&E breached their duty to warn of the general dangers of the subject machine, as well as the specific dangers of cleaning under the subject machine when they failed to provide adequate warnings of the product's potential risks.

137.

As a direct and proximate result of Defendants' failure to warn, MOORE was swept up and killed by the subject machine and suffered pre-death mental distress,

pain and suffering, fatal injuries, wrongful death, and damages for the loss of his life.

## COUNT VI:

## **Wrongful Death Against Defendants**

### 138.

Plaintiff re-alleges and incorporates by reference each of the allegations and numbered paragraphs set forth above as if fully set forth herein.

### 139.

MOORE died as a direct and proximate result of the negligent acts and omissions of the Defendants as described in this Complaint, individually and/or jointly.

### 140.

MOORE died with no surviving spouse and no surviving children.

### 141.

Wherefore, Plaintiff, as the Surviving mother of Malcom Moore, seeks to recover for the full value of the life of Malcom Moore under Georgia's wrongful death statutes due to the torts of the Defendants in this action as described above.

## COUNT VII:

### Estate Claims Under State Tort Law for Survival Injury Against Defendants

142.

Plaintiff re-alleges and incorporates by reference each of the allegations and numbered paragraphs set forth above as if fully set forth herein.

143.

As set out above, MOORE sustained suffering as a direct result of Defendants' acts and omissions which constitute violations of federal and state law.

144.

In her capacity as the Administrator of MOORE's Estate, Plaintiff is entitled to recover all damages to which MOORE would have been entitled had he survived. As a result of the Defendants' wrongful conduct, MOORE endured pain and suffering and was emotionally affected as a result of Defendants' acts and omissions prior to his death.

145.

Based on the foregoing, Plaintiff as the Administrator of her late son's Estate is entitled to recover from Defendants damages equal to all expenses incurred and to recover for MOORE's final expenses.

146.

Individually and jointly, Defendants recklessly, wantonly, consciously and or deliberately disregarded the risk that their actions posed to MOORE.  As a direct and proximate result of Defendants' conduct, Plaintiffs suffered, inter alia, substantial pain, suffering, discomfort, lost wages, and wrongful death.

## COUNT VIII:

## Punitive Damages Against Defendants

147.

Plaintiff re-alleges and incorporates by reference each of the allegations and numbered paragraphs set forth above as if fully set forth herein.

148.

Defendants actions in failing to construct, manufacture, sell, repair, maintain and design the products and sawmill described herein in a non-negligent and non-defective manner in spite of actual and constructive knowledge that the products and sawmill were defective, dangerous, and likely to cause death to others showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against the Defendants in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a trial by jury for damages, prays for the following relief, and requests that the Court:

a)     Allow a trial by jury on all issues so triable;

b)     Award Plaintiff damages against all Defendants;

c)     Award further relief as the Court deems equitable, proper, and just.

Respectfully submitted this 21st day of March, 2024.

ERIC J. HERTZ, PC

*/s/ Jesse A. Van Sant*
Jesse A. Van Sant
Georgia Bar Number 558101
*hertz@hertz-law.com*

8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Phone: (404) 577-8111
Fax: (404) 577-8116
*Counsel for Plaintiff*